UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>1) 275 CIRCULAR AVENUE, APARTMENT 2B, HAMDEN, CONNECTICUT ("TARGET LOCATION"); AND,<br><br>2) A CELLULAR TELEPHONE WITH CALL NUMBER 203-864-8308 ("TARGET TELEPHONE), SERVICED BY AT&T, WITH IMSI NUMBER 310280058450412, AND SUBSCRIBER RONALD VINCENT, 275 CIRCULAR AVENUE, APARTMENT 2B, HAMDEN, CT 06514 | Case No. 3:23 mj 804 (SDV)<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**

**AN APPLICATION FOR A SEARCH WARRANT**

I, Matthew Loucks, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18 of the United Sates Code. I have been employed as a Special Agent with the FBI since March 2020. I am a graduate of the FBI Training Academy in Quantico, Virginia, where I received training in diverse criminal matters, interviewing, interrogation, evidence collection, intelligence analysis, and legal matters, among other topics.  Prior to my employment as a Special Agent for the FBI, I spent five years employed as an Intelligence Analyst

for the FBI, and four years employed as a Contractor Analyst for the Department of Treasury, Financial Crimes Enforcement Network ("FinCEN").

2.    I am currently assigned to the FBI Bridgeport Safe Streets Task Force ("BSSTF"). The BSSTF is comprised of special agents from the FBI and the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), with troopers from the Connecticut State Police, and with detectives and officers of various area police departments, including the Bridgeport Police Department ("BPD"), Norwalk Police Department, and Trumbull Police Department. The focus of the investigative efforts of the BSSTF is crime related to violence, guns, and drugs, often perpetrated by organized groups or gangs. During the course of my career as a FBI Special Agent, FBI Intelligence Analyst, and FinCEN Analyst, I have participated in investigations of diverse crimes, including investigations into suspected homicides, kidnappings, narcotics trafficking, violent criminal activity, racketeering, and money laundering.  My participation in these investigations has included assisting in the controlled purchase of narcotics utilizing confidential sources; writing and executing search and arrest warrants; providing testimony in federal grand jury and state court proceedings; analyzing records related to narcotics trafficking, violent criminal activity, and money laundering or other violations of the Bank Secrecy Act; reviewing and analyzing cellular records and cell site location information; and reviewing and analyzing social media records and information.  I have participated in investigations into national and transnational organized criminal enterprises, including violent street gangs and large-scale narcotics trafficking organizations. I have attended gang and narcotics trainings sponsored by federal law enforcement. Finally, I have participated in investigations involving the use of court-authorized interception of wire and electronic communications.

3.    I am one of the case agents that have directed the investigation that is the subject

2

of this Affidavit, in conjunction with members of the BPD. I have participated fully in this investigation, and, as such, I am familiar with the circumstances of the investigation and the information set forth in this affidavit.

4.      Based on my training and experience set forth, I am familiar with methods employed by members of violent criminal enterprises ("VCEs") and drug trafficking organizations ("DTOs") in furtherance of their illegal businesses. I am familiar with the manner and means commonly employed by narcotics traffickers, firearms traffickers, members of criminal street gangs, and members of criminal organizations, including the manner and means by which these groups communicate and other methods employed to facilitate criminal activity and to avoid detection by law enforcement.

5.      From experience and training, I know that narcotics traffickers and members of violent criminal enterprises use cellular telephones to facilitate criminal activity and to avoid detection by law enforcement. Specifically, narcotics traffickers and members of violent criminal enterprises often use cellular telephones, and often speak to one another using coded, cryptic or slang words and phrases, in an effort to thwart law enforcement's attempts to identify them and their activities and to seize their drugs and/or assets. Based upon my training and experience, I know that drug traffickers frequently have access to several cellular telephones, and that they periodically use newly acquired cellular telephones. I also know that narcotics traffickers frequently use cellular telephones subscribed to other persons and pre-paid cellular telephones that require the purchaser to provide little or no identifying information to purchase and utilize the phone, all of which is done in an effort to avoid detection and thwart the efforts of law enforcement.

6.      I know, based upon my training and experience, that narcotics traffickers

3

sometimes segregate various aspects of their illicit business, and use different telephones to handle the various aspects of their operation to thwart law enforcement and insulate themselves and their confederates. For example, narcotics traffickers often use one phone to communicate with customers and another phone to communicate with their source(s) of supply. In addition, narcotics traffickers often use different phones to deal with different "lines" of customers. For example, a narcotics trafficker may use one phone to communicate with customers who regularly purchase small, pre-packaged quantities of narcotics and another phone for customers who regularly purchase larger quantities. Or, a narcotics trafficker may use different phones to distribute different types of narcotics. Similarly, narcotics traffickers whose business extends into multiple states, also sometimes use one phone for local customers and another phone for out-of-state customers. Finally, narcotics traffickers may utilize two or more cellular telephones interchangeably for all their narcotics trafficking undertakings. This enables drug dealers to accommodate a high volume of narcotics trafficking calls. The use of two or more phones interchangeably also enables distributors to immediately terminate service on one phone – if they believe the phone is being targeted by law enforcement – without crippling their illegal business.

7.    Through my training and experience as discussed above, I am familiar with the data and records that can be obtained by subpoena or court authorization relating to cellular telephones. I have obtained administrative subpoenas and court orders for cell phone information in this and other investigations and have participated in the analysis of such records.

8.    I submit this affidavit in support of an application for search warrants, pursuant to Federal Rule of Criminal Procedure 41, to search the following:

   1.    The residence located at 275 Circular Avenue, Apartment 2B Hamden, CT 06514 (hereafter, **"Target Location"**) which is the second multi-story

apartment from the left edge of a four-unit structure (facing the front of the structure) with white vinyl siding and a red front door. The alpha-numeric "2B" is clearly marked in a window at the top of the front door. The residence has a dividing wall between each apartment front door, and a small balcony above the front door. There is an attached garaged to the right of the front door; and,

2. A cellular telephone with call number 203-864-8308 (hereafter referred to as the "**Target Telephone**"), serviced by AT&T with IMSI number 310280058450412 and subscriber Ronald Vincent, 275 Circular Ave Apt 2B, Hamden, CT 06514 (**Target Location**), used by RONALD VINCENT.

9.    Based on my training, experience, and the facts set forth herein, there is probable cause to believe, and I do believe, that the **Target Location** and **Target Telephone** constitute and contain evidence of violations of Title 21 U.S.C. § 846 (Conspiracy and Attempts to Distribute Controlled Substances); 21 U.S.C. § 841(a)(1) (Unlawful Possession with Intent to Distribute, Distribution and/or Manufacture of Controlled Substances); and, 21 U.S.C. § 843(b) (Unlawful Use of Communication Facility) (collectively the "Subject Offenses") by RONALD VINCENT. Specifically, based on the investigation, I believe that, as detailed below, RONALD VINCENT resides at the **Target Location** and uses the **Target Location** to store the **Target Telephone** and other cellular telephones which he uses in furtherance of the **Subject Offenses**. Therefore, I believe there is probable cause to search the information described in Attachments A-1 and A-2 for evidence of these crimes further described in Attachments B-1 and B-2.

10.    As a result of my personal participation in this investigation, including the prior

monitoring of telephonic communications of RONALD VINCENT via court-authorized

interceptions of target telephones used by CHRISTIAN PICHARDO and EVERARD BOOTHE,

and my review of line sheets of same; analysis of reports and information provided to me by

other Special Agents, Task Force Officers, other members of the FBI, Drug Enforcement

Administration (DEA), and/or members of the BPD; physical surveillance of suspected criminal

activity; analysis of telephone toll information; debriefings of cooperating witnesses and sources

of information; controlled purchases of drugs; consensual recordings; and the review of other

reports and documents, I am familiar with the facts and circumstances of the **Subject Offenses**

described in this Affidavit. Unless otherwise indicated, all conversations and statements

described in this affidavit are related in substance and part and, where applicable, are based on

draft transcripts.

        11.     Since this Affidavit is being submitted for the limited purpose of securing search

warrants authorizing the search of the **Target Location** to locate and seize the **Target**

**Telephone** and other cellular telephones believed to be used by RONALD VINCENT, and the

subsequent examination of the **Target Telephone**, I have not included each and every fact

known to me concerning this investigation. I have set forth the facts that I believe are essential to

establish the foundation necessary to support a search warrant authorizing the search of the

**Target Location** and the search/examination of the **Target Telephone**. On the basis of my

familiarity and experience, I allege that the facts contained herein show there is probable cause to

believe that:

        12.     CHRISTIAN PICHARDO, EVERARD BOOTHE, RONALD VINCENT and

others, have committed, are committing, and will continue to commit the **Subject Offenses**

13.     The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

### III.     BACKGROUND OF INVESTIGATION

#### A.  Background of the South End Gang VCE/DTO

14.     Beginning in January 2010, the FBI led Bridgeport Safe Streets Task Force, ("BSSTF") began to investigate members and individuals aligned with the Bridgeport-based Marina Village Bloods ("MVB"), a violent criminal enterprise claiming national Bloods gang affiliation, operating out of the Marina Village Apartments housing complex and controlling neighborhoods in the South End of Bridgeport. Multiple sources of intelligence indicate that MVB's main source of income and related violence is attributable to narcotics sales. The gang controls its drug territory through the use of intimidation and threats of violence, shootings, and homicides. The BSSTF devoted considerable efforts to the investigation, employing several investigative methods, including but not limited to a Title III wiretap on cellular telephones used by certain targets. The wiretap phase of the investigation shed light on the MVB narcotics trade and revealed that the gang traffics multiple kilogram quantities of heroin and cocaine. The wiretap has also produced evidence that members of MVB have engaged in acts of violence on behalf of the gang.

15.     During that investigation, law enforcement seized heroin and crack cocaine, drug packaging material, tens of thousands of dollars, and Bloods gang paperwork, including copies of gang oaths, rules, and regulations. In addition, hundreds of rounds of ammunition and shell cases were recovered that were subsequently compared to ballistic evidence obtained in several

shootings and homicides.

16.      As a result of this investigation, at least 19 individuals tied to the MVB were convicted and sentenced in federal court for various narcotics and firearms related offenses. Demolition of the Marina Village housing complex began in 2018. Based on conversations with members of the BSSTF and BPD familiar with the period surrounding the demolition of the Marina Village housing complex, former residents, including known MVB gang members, relocated to various other areas throughout Bridgeport and/or nearby cities in Connecticut. Although MVB gang members relocated to other areas, they continued to gather in the same areas and locations in the South End of Bridgeport where they congregated prior to the demolition of the housing complex.

17.      In late 2021, the FBI BSSTF, along with BPD, began investigating the continued large-scale distribution of narcotics and acts of violence by members of the so-called "South End Gang," a violent criminal enterprise (VCE) and drug trafficking organization (DTO) operating in the South End of Bridgeport, CT. The ongoing investigation has revealed subjects previously associated with the MVB have reestablished control in the South End of Bridgeport and are believed to be distributing large quantities of heroin, marijuana, oxycodone, and crack cocaine. This investigation has expanded to include additional targets who are part of the renewed and reinvigorated South End Gang presence and who are committing acts of violence, distributing narcotics, engaging in firearm offenses, and committing other criminal acts. These South End Gang targets included MODESTE ADODO and TYRANTE YOUNG, both of whom are affiliated with CHRISTIAN PICHARDO.

**B.  Background Information on RONALD VINCENT**

18.      RONALD VINCENT is a 28-year-old male. He resides at 275 Circular Avenue,

Apartment 2B, Hamden, CT according to physical and electronic surveillance and subscriber information for the **Target Telephone**. Through the authorized monitoring of wire and/or electronic communications via target telephones, used by CHRISTIAN PICHARDO and EVERARD BOOTHE, investigators intercepted multiple calls between VINCENT and PICHARDO or BOOTHE wherein VINCENT, PICHARDO and/or BOOTHE discuss distributing narcotics, including heroin and fentanyl, and processing or manufacturing of narcotics.

### C. Background Information on CHRISTIAN PICHARDO

19.    CHRISTIAN PICHARDO is a 29-year-old-male. PICHARDO resides at 275 Circular Avenue Apartment 3B, Hamden, CT. PICHARDO has a criminal history that includes convictions for Possession with Intent to Sell Narcotics, Possession of a Controlled Substance, Sale of Illegal Drugs, and Alteration of a Firearm Identification. Based on a credible source of information as well as evidence obtained during the ongoing investigation, PICHARDO supplies drugs to members of the South End gang, to include MODESTE ADODO, TYRANTE YOUNG, as well as EVERARD BOOTHE, RONALD VINCENT, and others known and unknown.

20.    On a date in October of 2022 that is known to me, Cooperating Witness 1 ("CW-1")[1] conducted a consensually monitored and recorded controlled drug purchase of purported

_____

[1] Investigators utilized CW-1, who was an FBI Confidential Human Source ("CHS") from approximately July 2022 to March 2023, for both information and proactive action. CW-1 is familiar with and has direct access to MODESTE ADODO and other members of the South End Gang who are engaged in drug trafficking, acts of violence, firearms violations, and other criminal acts. Information received by CW-1 and set forth herein is believed to be accurate and reliable because much of the information has been corroborated. Specifically, information provided by CW-1 has led to arrests and the seizures of illegal narcotics, firearms, firearm-related evidence, and has been independently corroborated by investigators of the FBI and BPD. Investigators have also been able to corroborate significant portions of CW-1's information through consensual recordings, pen register and call detail record information, police reports, information, and proactive action by other cooperating witnesses and/or sources

heroin from ANDY MARTE, a South End Gang associate, at a location in Bridgeport, CT, also

known to me. Law enforcement surveilled the controlled drug purchase in its entirety, and

searched CW-1 and CW-1's vehicle for contraband before and immediately after the transaction,

yielding negative results. After the deployment of CW-1, CW-1 entered a vehicle with an

unknown female and TYRANTE YOUNG, another associate of the South End Gang, prior to

meeting with MARTE. While in the vehicle, the consensual monitoring device recorded

YOUNG placing an outgoing call from phone number 203-543-9696 to MODESTE ADODO on

phone number 203-822-0007, which law enforcement verified through toll records. During that

call, the consensual monitoring device recorded YOUNG asking ADODO for "CP's" number,

known to law enforcement as Christian PICHARDO. ADODO provided that number to YOUNG

over the phone, which the recording partially revealed to be 676-3254. Immediately after

YOUNG's call with ADODO, YOUNG placed another call and requested a quantity of drugs,

which the male on the other phone offered for a price of $60 a gram ("*Yeah. Price is 60"*). Law

enforcement analyzed the toll records for YOUNG's phone number, 203-543-9696, and

determined that the call YOUNG made on that date and time was to phone number 203-676-

3254, which is known by law enforcement to have been used by Christian PICHARDO at that

_____

of information, intelligence information, surveillance, controlled purchases of narcotics, and other investigative techniques. CW-1 had the ability to purchase narcotics at the direction and under the control of law enforcement agents by placing calls and/or sending text messages to cellular telephones used by ADODO and other members of the South End Gang. Throughout the course of the investigation, and as discussed in greater detail below, CW-1 conducted multiple controlled purchases of narcotics from MODESTE ADODO and other members of the South End Gang. CW-1 was cooperating with law enforcement for financial compensation. CW-1 has a criminal history that includes convictions for criminal possession of a firearm, ammunition, or an electronic defense weapon; assault in the first degree; and violation of probation. CW-1 was closed by the FBI in March 2023 after investigators learned CW-1 was a subject and/or person of interest in ongoing criminal investigations stemming from alleged unauthorized illegal activity he/she engaged in while operating as an FBI CHS.

time.

21.    Based on my training, experience, and knowledge of this investigation, I believe, in the presence of CW-1 wearing a consensually monitored device, YOUNG obtained the phone number for PICHARDO from ADODO. YOUNG proceeded to call PICHARDO to negotiate the purchase of a quantity of drugs from PICHARDO, which law enforcement corroborated between toll records and the recording of the conversation between YOUNG and PICHARDO on the consensual monitoring device.

**D.  Background Information on EVERARD BOOTHE**

22.    EVERARD BOOTHE is a 39-year-old-male. BOOTHE resides at in a basement apartment located at 18 Woodbridge Avenue, Ansonia, CT. BOOTHE has a criminal history that includes convictions for Criminal Possession of a Weapon, Possession with Intent, Assault 2, Assault 3, Interfering/Resisting Arrest, Larceny, and Sale of a Controlled Substance.

23.    Through the investigation, law enforcement identified BOOTHE as a drug supplier for the South End gang, and as an associate of ADODO, PICHARDO, VINCENT and others yet unknown, in the drug business.

**E.  Title III Wiretap Investigation into the South End Gang**

24.    As part of the investigation into the South End Gang, the FBI Bridgeport Safe Streets Task Force (BSSTF) conducted a Title III wiretap investigation into nine target telephone numbers used by multiple associates of the South End Gang. On April 20, 2023, the Honorable Kari A. Dooley authorized the interception of a target telephone used by PICHARDO, among other target telephones. On May 30, 2023, the Honorable Kari A. Dooley authorized continued interceptions of the prior target telephone used by PICHARDO, the initial interception of a new target telephone used by PICHARDO, and the initial interception of a target telephone used by

BOOTHE. On June 28, 2023, the Honorable Kari A. Dooley authorized the initial interceptions of a new target telephone, used by PICHARDO. On July 20, 2023, the Honorable Kari A. Dooley authorized the initial interceptions of a new target telephone, used by BOOTHE. As of July 28, 2023, the BSSTF is no longer intercepting wire communications.

25.     Pursuant to the Title III Wiretap investigation, the BSSTF monitored, recorded, and transcribed numerous pertinent calls and text messages which established probable cause that PICHARDO and BOOTHE used their respective target telephones in furtherance of the **Subject Offenses**. The **Target Telephone,** used by VINCENT, was not a target telephones of the Title III Investigation, but was intercepted on multiple calls establishing VINCENT's use of the **Target Telephone** in furtherance of the **Subject Offenses**.

## FACTS AND CIRCUMSTANCES SUPPORTING PROBABLE CAUSE

### A.  Verification that VINCENT Possesses and Uses the Target Telephone

26.     On September 5, 2023 at approximately 1:20 PM EST, your affiant and another BSSTF Task Force Officer (TFO) monitored real-time Close Circuit Television (CCTV) surveillance footage from the area of VINCENT's residence at 275 Circular Avenue, Hamden, CT. At this time, your affiant and the TFO observed a black Lexus four-door sedan parked facing west at the entrance of 275 Circular Avenue, Hamden, CT. Your affiant and the TFO recognized the vehicle to be the same make and model of a black Lexus ES 350 known by investigators to be operated by RONALD VINCENT. At approximately 1:30 PM, your affiant and the TFO observed CHRISTIAN PICHARDO approach the front driver-side door of the black Lexus sedan parked at the entrance of 275 Circular Avenue. Simultaneously, your affiant and the TFO observed the front driver-side window of the black Lexus sedan lower, which revealed VINCENT to be the operator of the black Lexus sedan. At this time, VINCENT began to engage

in conversation with PICHARDO. At approximately the same time that VINCENT lowered the

window, your affiant placed a call to the **Target Telephone** from a blocked telephone number.

Almost immediately, your affiant and the TFO heard a male answer your affiant's telephone call

saying, "Hello? Hello? Hello?" Simultaneous to hearing the male answer the call, your affiant

and the TFO visually observed, via the real-time CCTV footage, VINCENT answer a cellphone

with a blue backing or protective case. After approximately seven seconds, your affiant

terminated the telephone call. Simultaneous with your affiant terminating the telephone call, your

affiant and the TFO observed VINCENT appear to hang up his cellular telephone. Therefore,

based on my training and experience, I believe VINCENT to be the user of the **Target**

**Telephone**.

### B. VINCENT's use of the Target Telephone Facilitate Drug Trafficking

27.     On April 20, 2023, the Honorable Kari A. Dooley authorized the initial

interception of telephone number 203-676-3254 used by CHRISTIAN PICHARDO. On May 30,

2023, the Honorable Kari A. Dooley authorized the continued interception of 203-676-3254,

used by PICHARDO, and the initial interception of telephone number 203-868-1280, used by

PICHARDO, and telephone number 203-648-2139, used by EVERARD BOOTHE. On June 28,

2023, the Honorable Kari A. Dooley authorized the initial interceptions of telephone number

203-673-3747, used by PICHARDO.

28.     Pursuant to the Title III Wiretap investigation, the BSSTF monitored, recorded,

and transcribed numerous pertinent calls and text messages which established probable cause

that CHRISTIAN PICHARDO and EVERARD BOOTHE used the above-described target

telephones in furtherance of their drug trafficking activities. Furthermore, calls intercepted over

203-676-3254 and 203-673-3747, used by PICHARDO, and 203-648-2139, used by BOOTHE,

showed that RONALD VINCENT was actively involved in the distribution, processing, and/or manufacturing of drugs/narcotics with PICHARDO and EVERARD BOOTHE.

29.     The following are examples of some of the communications law enforcement intercepted on PICHARDO's and BOOTHE's target telephones pertaining to RONALD VINCENT and their drug trafficking activities.

30.     On April 26, 2023, the Title III wiretap of telephone number 203-676-3254 revealed that PICHARDO used 203-676-3254 to speak to RONALD VINCENT, via the **Target Telephone,** which is transcribed below:

*RV: You end up putting that shit together yesterday?*

*CP: Yesterday they got that good [U/I].*

*RV: I did, I did the one yesterday I gave to my [U/I]. That shit fire.*

*CP: What, the um, the H?*

*RV: Uh, I did it with Boothe.*

*CP: Oh you mixed it?*

*RV: Yeah I did it with Boothe and I put like seven on them [U/I].*

*CP: [U/I] sells crack?*

*RV: Yeah they say that shit was fire.*

*CP: Yeah I just put them shits there this morning (UI)*

31.     Based on my training, experience, and knowledge of this investigation, I believe in the aforementioned conversation, VINCENT and PICHARDO discussed packaging and/or processing heroin for distribution ("*…what, um, the H?*"). I believe when VINCENT says he did it with BOOTHE, he is telling PICHARDO that he and EVERARD BOOTHE mixed heroine and/or crack-cocaine to sell.

32.     On May 6, 2023, the Title III wiretap of telephone number 203-676-3254 revealed

that PICHARDO used 203-676-3254 to speak to RONALD VINCENT, via the **Target Telephone,** which is transcribed below:

> *CP: Alright… I'm gonna call you anyways 'cause, ummm, I don't got them, you know, purple shits on me but I think I got something down there lined up, so… I'm gonna let you know when they call me.*
>
> *RV: Alright. Just hit me.*

33.      Based on my training, experience, and knowledge of this investigation, I believe in the aforementioned conversation, VINCENT and PICHARDO discussed acquiring purple fentanyl (*"the purple shit"*). I believe when PICHARDO said to VINCENT, *"I don't got them… purple shits on me…"*, he meant he did not have purple fentanyl in his possession at that time. I believe PICHARDO then told VINCENT, that he (PICHARDO) was in the process of trying to acquire a new supply of purple fentanyl from his supplier, possibly located in the area of New York City, (*"… but I think I got something down there lined up…"*), and that he would call VINCENT when he speaks with his supplier (*"I'm gonna let you know when they call me."*). I believe VINCENT acknowledges and reiterates for PICHARDO to call him after PICHARDO speaks with his supplier (*"Alright. Just hit me."*).

34.      On May 14, 2023, the Title III wiretap of telephone number 203-676-3254 revealed that PICHARDO used 203-676-3254 to speak to RONALD VINCENT, via the **Target Telephone,** which is transcribed below:

> *CP: What's the word bro?*
>
> *RV: I'll prolly come grab 3.5, then bring the shit back to you.*
>
> *CP: Ight… Let me know when you coming.*
>
> *RV: Aight.*

35.    Based on my training, experience, and knowledge of this investigation, I believe in the aforementioned conversation, VINCENT called PICHARDO to tell PICHARDO that he planned to meet PICHARDO to obtain 3.5 grams of a drug/narcotic substance (*"I'll prolly come grab 3.5…"*) and would meet PICHARDO at a later time to either return the drugs/narcotics or pay him for the drugs/narcotics (*"… then bring the shit back to you."*). Thereafter, I believe PICHARDO agreed to give VINCENT 3.5 grams of a drug/narcotic substance and advised VINCENT tell him when he was on his way to meet him (*"Ight… Let me know when you coming."*).

36.    On May 22, 2023, the Title III wiretap of telephone number 203-676-3254 revealed that PICHARDO used 203-676-3254 to speak to RONALD VINCENT, via the **Target Telephone,** which is transcribed below:

*CP: You about to head up?*

*RV: Yeah.*

*CP: Alright. I'm up here… I got something for you.*

*RV: Huh?*

*CP: I said I got something for you here. I'm gonna get um, get the rest later on.*

*RV: Oh it's the same shit?*

*CP: What?*

*RV: The uh, the "F's?" It's the same thing?*

*CP: Yeah.*

*RV: Aight. I'm about to head up right now.*

37.    Based on my training, experience, and knowledge of this investigation, I believe in the aforementioned conversation, VINCENT and PICHARDO discussed fentanyl

16

PICHARDO had in his possession to give to VINCENT. I believe when PICHARDO said, *"I got something for you here. I'm gonna get um, get the rest later on"*, he meant that he had narcotics to give to VINCENT and would get more narcotics for VINCENT at a later time. I believe when VINCENT responded and said, *"The uh, the F's? It's the same thing?"*, he was asking PICHARDO whether he had the same fentanyl (*"F's"*) he acquired from PICHARDO in the past, which I believe PICHARDO confirmed it was (*"Yeah."*). I believe when VINCENT said, *"Aight. I'm about to head up now"*, he meant he was on his way to pick up the fentanyl from PICHARDO.

38.    On June 1, 2023, the Title III wiretap of telephone number 203-676-3254 revealed that PICHARDO used 203-676-3254 to speak to RONALD VINCENT, via the **Target Telephone,** which is transcribed below:

> *RV: Yo... What was the, um, total for the purple?*
>
> *CP: Uhhh... 1750.*
>
> *RV: Aight. Fuck, um.... Watchu had needed?*
>
> *CP: I mean shit... whatever you could give.*

39.    Based on my training, experience, and knowledge of this investigation, I believe in the aforementioned conversation, VINCENT and PICHARDO discussed the price of purple fentanyl. I believe when VINCENT asked PICHARDO, *"What was the... total for the purple?"*, he was asking PICHARDO how much it costs PICHARDO to get a resupply of purple fentanyl. I believe when PICHARDO responded and said, *"1750"*, he meant he pays his supplier $1,750 for a quantity of purple fentanyl. I believe when VINCENT responded and asked, *"Whatchu had needed?"*, he was asking PICHARDO how much money he needed from VINCENT to contribute toward the purchase of a resupply of purple fentanyl. I believe when PICHARDO

responded and said, *"... whatever you could give"*, he meant he would accept however much money VINCENT was willing to contribute toward the price of the purple fentanyl.

40.     On June 1, 2023, the Title III wiretap of telephone number 203-648-2139 revealed that EVERARD BOOTHE used 203-648-2139 to speak to RONALD VINCENT, via the **Target Telephone**, to discuss drug-related activity, which is transcribed below:

> *RV: ... I'm mad I gave my G some of that other shit bro. They be chasing that now.*
>
> *EB: That purple shit?*
>
> *RV: No the regular I put together.*
>
> *EB: Yeah they like that regular shit, I'm telling you.*
>
> *RV: That's what I'm saying bro.*
>
> *EB: The purple is too strong.*
>
> *RV: Bro since, since I talked to you. I haven't sold a blip of that purple at all. Like I might have to give it to my boy that be coming like every Tuesday...*
>
> *EB: Maybe we got to cut that purple shit again.*
>
> *RV: Or we do gotta do it slowly bro. 'Cause what I do, I do it bit by bit. I be using too much at once. That's what me and Swerve talked about this morning. I said (U/I) we use too much at once. So what I do like, like ten and ten like that little stuff in blenders...*
>
> *EB: I feel like we should go get new blenders for that shit.*
>
> *RV: That too. That too.*
>
> *EB: You go get like three new blenders. Do like ten, ten in each go round like and then, and then mix 'em.*

41.     Based on my training and experience, and my participation in this and other drug investigations, I believe, in this call, VINCENT and BOOTHE discussed their participation in

the manufacture and sale heroin and fentanyl. On information and belief, when VINCENT said, *"I'm mad I gave my G some of that other shit bro. They be chasing that now"*, he meant he was upset he sold/gave a batch of drugs to an associate ("G") because his drug customers want more of it (*"They be chasing that now"*). When BOOTHE asked, *"That purple shit?"*, I believe he was clarifying whether VINCENT was talking about purple fentanyl. VINCENT clarified he was talking about regular heroin he manufactured (*"No the regular I put together"*). I believe when BOOTHE said, *"Yeah they like that regular shit... the purple is too strong"*, he meant the drug customers like the regular heroin, but they think the purple fentanyl is too strong. VINCENT indicated he has not been able to sell the purple fentanyl (*"I haven't sold a blip of that purple at all."*) and he considered giving the purple fentanyl to an individual he sells drugs to every Tuesday (*"I might have to give it to my boy that be coming like every Tuesday..."*).

42.     I believe BOOTHE and VINCENT then began to discuss how they should go about processing and manufacturing the purple fentanyl. On information and belief, when BOOTHE said, *"Maybe we got to cut that purple shit again,"*, he meant he and VINCENT should mix the fentanyl with more cutting agent to attempt to make it less strong. VINCENT responded and said he spoke with CHRISTIAN PICHARDO (also known as "Swerve") and they discussed how they should mix the fentanyl with cutting agent slower (*"Or we... gotta do it slowly bro... I be using too much at once. That's what me and Swerve talked about this morning... I said (U/I) we use too much at once..."*). VINCENT then described his process for mixing the narcotics with cutting agent inside a blender ("*So what I do like, like ten and ten like that little stuff in blenders."*). BOOTHE then suggested they should get new blenders specifically for mixing the fentanyl (*"I feel like we should go get new blenders for that shit."*).

43.     Later that same day, June 1, 2023, EVERARD BOOTHE used telephone number

203-648-2139 to place an outgoing call to RONALD VINCENT, via the **Target Telephone**, to discuss getting resupplied with narcotics by CHRISTIAN PICHARDO (also known as "Swerve"). Pertinent portions of this conversation are as follows:

> *EB: Swerve said tomorrow.*
>
> *RV: Tomorrow?*
>
> *EB: That's what he told me.*
>
> *RV: He said today or tomorrow bro.*
>
> *EB: Tonight or tomorrow. I know he was gonna hit him so…*
>
> *RV: Shit I'll probably see the nigga tomorrow then fuck it.*
>
> *EB: Let me see how my day go. I might need a (U/I) tomorrow.*

44.      Based on my training and experience, and my participation in this and other drug investigations, I believe VINCENT and BOOTHE discussed their intent on obtaining a new supply of narcotics from CHRISTIAN PICHARDO. On information and believe, when BOOTHE said, *"Swerve said tomorrow"*, he meant PICHARDO told BOOTHE he was getting resupplied with drugs the following day (June 2, 2023). I believe VINCENT was told by PICHARDO that he would be resupplied that same day (June 1) or the following day (June 2) (*"He said today or tomorrow bro."*). I believe when BOOTHE said, *"Tonight or tomorrow. I know he was gonna hit him so…"*, he meant PICHARDO was going to call his drug supplier (*"I know he was gonna hit him…"*), so he could get a new supply as early as that same night or the following day (*"Tonight or tomorrow."*). VINCENT indicated he would just plan on seeing PICHARDO the following day to get the drugs (*"I'll probably see the nigga tomorrow then. Fuck it."*

45.      On June 5, 2023, EVERARD BOOTHE, using telephone number 203-648-2139,

20

and RONALD VINCENT, using the **Target Telephone**, engage in a lengthy conversation that briefly turned drug-related and pertinent. Portions of this conversation are as follows:

> EB: 'bout to do?
>
> RV: Shit. I'm 'bout to go to the Port, see like two people and then I don't know. I got nothing planned. I'm tryna see if Swerve go get right, 'cause I'm tryin', I'm tryin' to get right. Nigga, that's what I wanted to do all day.

46.     On information and belief, when VINCENT told BOOTHE, *"I'm tryna see if Swerve go get right…"*, he meant he was trying to determine whether CHRISTIAN PICHARDO (a.k.a. "Swerve") got a new supply of drugs from his supplier because VINCENT is trying to get his portion of the drugs from PICHARDO (*"… 'cause I'm tryin', I'm tryin' to get right."*). VINCENT advised he planned on selling drugs all day (*"Nigga, that's what I wanted to do all day."*) but has been unable to do so because he has not been resupplied by PICHARDO.

47.     Later that same day, on June 5, 2023, EVERARD BOOTHE, using telephone number 203-648-2139, and RONALD VINCENT, using the **Target Telephone**, engaged in another lengthy drug-related conversation. Pertinent portions of the conversation are as follows:

> EB: What niggas doing with the taffy?
>
> RV: Nigga, that shit, I don't know. I told you I still got them two buns, I paid Swerve though, but I got them two buns left.
>
> EB: Buns or sticks?
>
> RV: Nah two sticks. I'm bugging, two and a half. I'm waiting for someone to come now. I'm giving that nigga that shit tomorrow, fuck that… I don't know what niggas doing though. I'm trying to see if Swerve got some, I'm trying to get right. I think he said something like he gotta see the nigga or some shit.

21

*EB: He waiting for it. He said he gonna drop something off to me.*

*RV: When he getting some, today?*

*EB: Said he was trying to do today.*

*RV: He ain't really tell me, he said today or tomorrow, but I ain't gonna hold you. That nigga get that shit today, that gonna be perfect 'cause nigga I'll go to the crib and just do that all night. (UI) everything ready, then tomorrow when I see that nigga I'll just give him the other two. I'll give him the other two and then, I'll owe Swerve. I give him the shit today for that 100. I'll give him that shit, and I'll owe him like 500.*

*EB: You said what Jig?*

*RV: I said I'll probably give Swerve what I owe his ass and take a 100, but Imma owe him like 500, fuck that. Imma get rid of that shit tomorrow and then get that bread and pay him off the rest of it. Fuck that. (UI) today or tomorrow, I don't even wanna go in the chicken coup, I might have to go in that shit today or tomorrow, I mean tomorrow probably for fucking Norrie. I mean not Norrie, for Janel fucking (UI).*

48.    Based on my training and experience, and my participation in this and other drug investigations, I believe when VINCENT told BOOTHE, *"I still got them two buns"*, he means he still has two bundles ("*buns*") of heroin or fentanyl, but he already paid CHRISTIAN PICHARDO (a.k.a. "Swerve") money he owed him (*"I paid Swerve though"*) for the drugs. When BOOTHE asked, *"Buns or sticks?"*, I believe he is attempting to clarify the quantity of drugs VINCENT possessed. Based on my training and experience, and my participation in this and other drug investigations, I understand the term "bundle" to be used to describe 10 small glassine bags of heroin/fentanyl weighing approximately one gram, and a "stick" is a used to reference 10 bundles of heroin/fentanyl, weighing approximately 10 grams. Therefore I believe

when VINCENT responded to BOOTHE and said, *"Nah two sticks. I'm bugging, two and a half"*, VINCENT was indicating he had approximately two and a half sticks, or 25 bundles of heroin/fentanyl. VINCENT advised BOOTHE he was waiting for an unknown party to come purchase a quantity of the heroin/fentanyl he had in his possession. I believe VINCENT then advised BOOTHE he is trying to see if PICHARDO has more heroin/fentanyl (*"I'm trying to see is Swerve got some…"*) so he can sell more drugs to make more money (*"I'm trying to get right."*). On information and belief, when BOOTHE responded and said, *"He waiting for it. He said he gonna drop something off to me"*, he meant PICHARDO informed him he was still waiting for his resupply of drugs, but that PICHARDO said he was going to drop some drugs off to BOOTHE (*"He said he gonna drop something off to me."*). On information and belief, when VINCENT said, *"That nigga get that shit today, that gonna be perfect 'cause I'll go to the crib and just do that all night"*, he meant if PICHARDO got resupplied with drugs that same day, VINCENT would get his portion of the drugs from PICHARDO and work all night to process the drugs to then sell to his customers. On information and belief, when VINCENT said, *"I'll probably give Swerve what I owe his ass and take a 100"*, I believe he meant he would sell the drugs he had on hand and use the proceeds to pay PICHARDO money VINCENT owed him, at which time VINCENT would obtain another quantity of narcotics from PICHARDO (*"… and take a 100"*) for which he would then owe PICHARDO another $500 (*"… but Imma owe him like 500…"*).

49.    On June 12, 2023, EVERARD BOOTHE, using telephone number 203-648-2139, and RONALD VINCENT, using the **Target Telephone**, discussed the processing and manufacturing of narcotics. Pertinent portions of this conversation are as follows:

   *EB: Nigga, I put fuckin' [Pauses] I put 18 on 12. You heard?*

23

*RV: [Laughs]*

*EB: Nigga I gave it to... Nigga I gave it to from Stamford said is fire?*

*RV: Yo I'm fuckin' dead!*

*EB: I thought I put 16. [Pauses]... I made 30 out of this shit. You heard? I don't know when Bobby Shmurda gonna get right again [chuckles].*

*[VINCENT and BOOTHE continue to discuss CHRISTIAN PICHARDO, whom they jokingly refer to as Bobby Shmurda.]*

*RV: I just... earlier I put the rest I had left. Remember last week I had grabbed. Not last week, but like two days before you. That's when I had got 15. So I did like 10 of that shit. Nigga, just now with the rest of the five. I just put another five on that other five. I got like 10 joints...*

50.      Based on my training and experience, and my participation in this and other drug investigations, I believe in this portion of their communications, VINCENT and BOOTHE are discussing their methods for processing and manufacturing narcotics. I believe when BOOTHE said, *"I put 18 on 12"*, he meant mixed a quantity (*"18"*) of one substance (believed to be heroin or fentanyl) with a quantity (*"12"*) of another substance (believed to be heroin or fentanyl), to make a single substance (*"I made 30 out of this shit."*). On information and belief, when VINCENT said, *"... like two days before you. That's when I had got 15"*, he meant two days before BOOTHE obtained a quantity of narcotics, VINCENT obtained a quantity (*"15"*) of suspected heroin or fentanyl. VINCENT indicated he a portion of those narcotics (*"So I did like 10 of that shit."*) and subsequently mixed the remainder with another substance (*"... just now with the rest of the five. I just put another five on that other five"*) to double he quantity of the narcotic substance (*"I got like 10 joints..."*).

51.     On June 30, 2023, the Title III wiretap of telephone number 203-673-3747
revealed that PICHARDO used 203-673-3747 to speak to RONALD VINCENT, via the **Target
Telephone,** which is transcribed below:

> *RV: ... Yo you ain't ever get right?*
>
> *CP: Nah. The nigga say he gonna pull up on me tomorrow.*
>
> *RV: Shit. This nigga take long as hell. I'm trying to see it.*
>
> *CP: I ain't trying to go up there, so he said he'd come down here tomorrow.*

52.     Based on my training, experience, and knowledge of this investigation, I believe
in the aforementioned conversation, VINCENT and PICHARDO discussed when PICHARDO
would be getting a new supply of drugs. I believe when VINCENT asked, *"Yo you ain't ever get
right?"*, he was asking PICHARDO if he ever got his resupply of drugs/narcotics. I believe
PICHARDO advised VINCENT he did not get the resupply (*"Nah."*), but that his supplier was
going to meet with him (PICHARDO) the next day to give him the drugs/narcotics (*"The nigga
say he gonna pull up on me tomorrow."*). I believe when VINCENT said, *"This nigga take long
as hell. I'm trying to see it",* he was voicing his frustration that PICHARDO's supplier was
taking a long time to resupply him, which in turn was delaying VINCENT from obtaining his
share of the drugs to resell.

53.     On July 1, 2023, CHRISTIAN PICHARDO, using telephone 203-673-3747, and
RONALD VINCENT, using the **Target Telephone**, discussed VINCENT's sale of
drugs/narcotics. Pertinent portions of this conversation are as follows:

> *CP: What's you on though?*
>
> *RV: I ain't shit. I'm in the Port nigga. I'm fucking waiting around for my jug. I'm about
> to leave. This nigga taking too long too.*

*CP: Yeah I'm up top right now. I ain't doin' shiot though...*

54.      Based on my training, experience, and knowledge of this investigation, I believe in the aforementioned conversation, VINCENT advised PICHARDO that he was in Bridgeport, CT (*"I'm in the Port nigga."*) waiting to meet with his drug customer (*"I'm fucking waiting around for my jug... This nigga taking too long."*). Based on my training and experience, and my participation in this and other drug investigations, I know drug dealers sometimes refer to their drug customers as "jugs".

55.      Later in the same conversation, VINCENT and PICHARDO discuss PICHARDO's anticipated resupply of narcotics. Pertinent portions of this conversation are as follows:

*CP: I'm at the crib. I'm still waiting on the shit. The nigga (Pauses), he just sent me now talking about some tomorrow morning. I'm like nigga, "You said that yesterday."*

*RV: You know how that shit be.*

*CP: [Laughs]*

*RV: It's hot outside nigga. Niggas is not trying to come outside.*

*CP: I'm talking to him like, "Nigga! You see what today's date is. I need that shit today." He like... "Nah." He said, "I could try to come later." He said, "But what about in the morning, first thing in the morning." I said, "Nigga, if I tell you that then I know you not gonna come later."*

*RV: Word to me.*

*CP: I'm like, "That don't make no sense. Just tell me when you gonna come."... So most likely in the morning.*

26

*RV: ... I think I told my nigga like Sunday anyways honestly. I just told him some bullshit. I'm like, "Yo, you gonna wait or not like?" He was like, "Yeah, 'ight. Just let me know."*

56.    Based on my training, experience, and knowledge of this investigation, I believe in the aforementioned conversation, VINCENT and PICHARDO discussed when PICHARDO would be getting a new supply of drugs. I believe when PICHARDO told VINCENT, *"I'm still waiting on the shit. The nigga (Pauses), he just sent me now talking about some tomorrow morning..."*, he meant he (PICHARDO) was still waiting for his resupply of drugs/narcotics and that his supplier indicated he would be ready to resupply PICHARDO the following morning. I believe PICHARDO then told VINCENT that he told the supplier he needed the resupply that same day (*"Nigga. You see what today's date is. I need that shit today."*). I believe when VINCENT told PICHARDO, *"I think I told my nigga like Sunday anyways honestly. I just told him some bullshit..."*, he meant that he (VICENT) told one of his drug customers he would probably have a resupply of drugs/narcotics to sell him the following day (Sunday July 2, 2023). I believe when VICENT said, *"I'm like, "Yo, you gonna wait or not like?""*, he meant that he (VINCENT) asked the customer if he was going to wait until Sunday to get the drugs from VINCENT, to which the customer responded he would (*"He was like, "Yeah, 'ight. Just let me know""*).

### C.    VINCENT uses Additional Cellular Telephones to Facilitate Drug Trafficking

57.    Pursuant to the aforementioned Title III Wiretap investigation, the BSSTF monitored, recorded, and transcribed pertinent communications intercepted over the target telephones used by CHRISTIAN PICHARDO and EVERARD BOOTHE, which showed that RONALD VINCENT utilized another cellular telephone(s), in addition to the **Target Telephone**, in furtherance of his drug trafficking activities.

27

58.    The following are examples of some of the communications law enforcement intercepted on PICHARDO's and BOOTHE's target telephones pertaining to RONALD VINCENT's use of additional telephones in furtherance of his drug trafficking activities.

59.    On July 7, 2023, at approximately 9:08 AM EST, CHRISTIAN PICHARDO, using telephone 203-673-3747, and RONALD VINCENT, using the **Target Telephone**, discussed an incident that occurred on July 6, 2023, involving two of PICHARDO's and VINCENT's drug customers, known to investigators as Marissa Ciambriello and Robert Hainsworth. Pertinent portions of this conversation are as follows:

RV: ... Yo. She [Marissa Ciambriello] *texted me the same shit... She been texted me just now.*

CP: *I just got off the phone with her.*

RV: *Yeah nigga. She just texted me...*

CP: ... *She was talking mad shit about Rob* [Robert Hainsworth].

RV: *Word? What she said?*

CP: She said..., "He don't want to admit it, but I'm the reason why we got outta there (U/I)." ... She said, "He a dumb dumb." She said, "The dumb dumb did two bags and was fuckin' moving all around the fuckin' car." She said, "That's why I think they stopped us. 'cause he lookin' fuckin' crazy."

RV: I tried to call him [Robert Hainsworth] bro. He texted yesterday by himself, but he ain't answer...

60.    Based on my training, experience, and knowledge of this investigation, I know that in the above-described conversation, VINCENT and PICHARDO were discussing telephonic communications each of them had with their drug customers Marissa Ciambriello

28

and/or Robert Hainsworth regarding a motor vehicle stop that Ciambriello and Hainsworth were subject to the previous day, on July 6, 2023. Based on my participation in this investigation, I know that on July 6, 2023, members of the BSSTF and the BPD Regional Auto Theft Task Force conducted an investigative stop of a motor vehicle registered to and operated by Marissa Ciambriello. The investigative stop was predicated on telephone calls intercepted between PICHARDO (using target telephone 203-673-3747) and Hainsworth (using telephone number 959-229-1818), on July 6, 2023, wherein PICHARDO and Hainsworth arranged to meet for what investigators believed, based on training, experience, and familiarity with the investigation, to be a drug transaction. During the investigative stop, the operator of the vehicle, Ciambriello, and the front seat passenger, Hainsworth, were both asked to step out of the vehicle. A search of the passenger's compartment subsequently resulted in the location of drug paraphernalia and narcotics which later field tested positive for the presumptive presence of heroin.

61.     Based on my training, experience, and my participation in this investigation, I believe when VINCENT said, *"She texted me the same shit. She been texted me just now…"*, he meant that prior to receiving the above-described call from PICHARDO, Ciambriello was communicating with VINCENT via text message. I believe when PICHARDO said, *"I just got off the phone with her…"*, he meant that prior to making the above-described call to VINCENT, Ciambriello and PICHARDO were communicating via a voice call.

62.     Based on this information, investigators subsequently reviewed communications intercepted over target telephone number 203-673-3747, used by PICHARDO, occurring on July 7, 2023. The review revealed that on July 7, 2023, beginning at approximately 8:50 AM EST and ending at approximately 9:08 AM EST (just prior to PICHARDO's call with VINCENT), PICHARDO used telephone number 203-673-3747 to engage in a lengthy conversation with

Ciambriello, who used telephone number 203-394-3261, regarding the traffic stop.

63.     Investigators also analyzed pen register call data for the **Target Telephone**, used by VINCENT, to review calls that occurred on July 7, 2023, in an attempt to identify the above-described communications that VINCENT told PICHARDO he had with Ciambriello (using telephone number 203-394-3261) and/or Hainsworth (using telephone number 959-229-1818) on July 6, 2023 and/or July 7, 2023. The review of the pen register call data for the **Target Telephone**, however, did not reveal any calls between VINCENT, using the **Target Telephone**, and Ciambriello (using telephone number 203-394-3261) or Hainsworth (using telephone number 959-229-1818).

64.     Therefore, based on my training and experience, and my participation in this and other drug investigations, I believe VINCENT has another cellular telephone(s) and that he used another cellular telephone(s), separate and apart from the **Target Telephone**, to communicate with Ciambriello and/or Hainsworth on July 6, 2023 and/or July 7, 2023.

65.     On June 9, 2023, EVERARD BOOTHE, using target telephone 203-648-2139, and RONALD VINCENT, using the **Target Telephone**, discussed getting resupplied with drugs/narcotics from CHRISTIAN PICHARDO. While monitoring this telephone call, investigators overheard another phone ringing in the background of the call, at which time VINCENT is heard saying, *"Yo. What the fuck this nigga want?"*. Investigators then heard VINCENT answer a call on another phone and talk to an unknown third partying saying, *"Yo. Yeah... nah I'm s-... I'm good. Nah I'm good... (U/I)."* VINCENT then ends the call on his second telephone and re-engaged in conversation with BOOTHE via the **Target Telephone**.

66.     On May 23, 2023, CHRISTIAN PICHARDO, using target telephone 203-676-3254, and RONALD VINCENT, using the **Target Telephone**, discussed how VINCENT was in

the middle of a drug transaction. Pertinent portions of this conversation are as follows:

> CP: ... What you on?
>
> RV: I'm trying to see this jug real quick. He had some pills, but he acting scary. Nigga scaring me, like...

67.     Based on my training, experience, and participation in this investigation, I believe when VINCENT told PICHARDO, *"I'm trying to see this jug real quick...",* he meant he was trying to meet up with a drug customer ("jug"). While monitoring this telephone call, investigators overheard VINCENT answer another call on a different phone, at which time VINCENT is heard talking to an unknown third party saying, *"Yo. What's good? Where you at?... I'm out here... I'm in this blue joint...".* I believe VINCENT (while still using the **Target Telephone** to talk to PICHARDO) placed an outgoing call to his drug customer ("jug") to find out where the customer was (*"Where you at?"*) and to tell the customer he was waiting for them in a blue car (*"I'm out here... in this blue joint..."*). VINCENT then ends the call on his second telephone and re-engaged in conversation with PICHARDO regarding his pending drug transaction:

> CP: You tryna buy some pills?
>
> RV: Nigga I was supposed to trade that nigga. I was supposed to buy some, but trade 'em...
>
> CP: What kind of pills is...?
>
> RV: He got some, um, some Xans.
>
> CP: Ahhh, he's probably just fried.
>
> RV: Real shit... So hold on, hold on, hold on (phone ringing in the background).

68.     Based on my training, experience, and participation in this investigation, I believe

VINCENT discussed with PICHARDO how he was supposed to trade unknown drugs/narcotics with his drug customer (*"Nigga I was supposed to trade that nigga. I was supposed to buy some, buy trade 'em…"*) for Xanax pills (*"He got some… Xans."*). At this point in the call, investigators monitoring the call between PICHARDO and VINCENT (using the **Target Telephone**) overheard another telephone ringing in the background of the intercepted call. Simultaneously, investigators heard VINCENT tell PICHARDO, *"… hold on, hold on, hold on…"*, at which point VINCENT is then heard talking to an unknown third party saying, *"… Nah Barlett. It's over there… You can try that shit bro… I put it over there by the pole. It's gonna be in the white, um… you gonna have to turn around. It's over there by the pole. Just try it and let me know… You'll see it. It's gonna be in a little, a little bag."* I believe the ringing investigators heard in the background of the intercepted call between PICHARDO and VINCENT was an additional cellular telephone that VINCENT used to communicate with his drug customer. I believe that when VINCENT answered the incoming call to his additional cellular telephone, he directed his drug customer to a specific street (*"Nah. Barlett. It's over there…"*) to retrieve drugs/narcotics that VINCENT placed near a pole located on Barlett (*"I put it over there by the pole… by the pole on Barlett… You'll see it. It's gonna be in a little, a little bag…"*). VINCENT then ends the call on his second telephone and re-engaged in conversation with PICHARDO.

69.    On September 5, 2023 at approximately 1:20 PM EST, your affiant and another BSSTF Task Force Officer (TFO) monitored real-time Close Circuit Television (CCTV) surveillance footage from the area of VINCENT's residence at 275 Circular Avenue, Hamden, CT. At this time, your affiant and the TFO observed a black Lexus four-door sedan parked at the entrance of 275 Circular Avenue, Hamden, CT. Your affiant and the TFO recognized the vehicle to be the same make and model of a black Lexus ES 350 known to be operated by RONALD

VINCENT. At approximately 1:30 PM, your affiant and the TFO observed CHRISTIAN

PICHARDO approach the front driver-side door of the black Lexus sedan parked at the entrance

of 275 Circular Avenue. Simultaneously, your affiant and the TFO observed the front driver-side

window of the black Lexus sedan lower, which revealed VINCENT to be the operator of the

black Lexus. At this time, VINCENT began to engage in conversation with PICHARDO while

remaining seated inside the black Lexus sedan. Shortly thereafter, VINCENT exited the black

Lexus sedan and continued to engage in conversation with PICHARDO. At approximately 1:33

PM, while still conversing with PICHARDO, your affiant and the TFO observed, via the real-

time CCTV footage, VINCENT retrieve two cellular telephones from his left front pants pocket.

One cellular telephone appeared to have a blue backing/protective case, and the other cellular

telephone appeared to be dark in color.

70.     On September 6, 2023, your affiant and another BSSTF Task Force Officer (TFO)

conducted physical surveillance in the area of VINCENT's residence at 275 Circular Avenue,

Hamden, CT. Simultaneously, the BSSTF was monitoring the same area via real-time Closed-

Circuit Television (CCTV) surveillance. While conducting physical surveillance, at

approximately 1:28 PM, your affiant and the TFO observed a black Lexus four-door sedan,

bearing CT registration AT18337 – known by investigators to be operated previously by

VINCENT (hereinafter, "VINCENT's vehicle) – drive south on Circular Avenue before turning

left into the parking lot for the apartments located at 275 Circular Avenue. VINCENT's vehicle

pulled into the parking lot at 275 Circular Avenue and immediately turned around and parked

near a communal mailbox facing Circular Avenue (west). At approximately 1:30 PM, your

affiant and the TFO observed CHRISTIAN PICHARDO approach the driver side of

VINCENT's vehicle, at which time VINCENT exited the vehicle and engaged in a lengthy

conversation it PICHARDO. While reviewing the CCTV surveillance footage, your affiant observed that at approximately 1:48 PM, VINCENT (while talking with PICHARDO) retrieved a cellular telephone from his right front pants pocket. VINCENT briefly glanced at the cellular telephone before returning the cellular telephone to his right front pants pocket. Approximately nine seconds later, your affiant observed VINCENT retrieve a different cellular telephone from his left front pants pocket. At approximately 1:53 PM, PICHARDO departed the area and walked toward his residence at 275 Circular Avenue, Apartment 3B. At the same time, VINCENT re-entered his the front driver side of his vehicle. Approximately two minutes later, VINCENT placed his vehicle in reverse and parked near a communal dumpster located in the parking lot of 275 Circular Avenue. Thereafter, the TFO conducting physical surveillance observed VINCENT exit his vehicle and enter the residence of 275 Circular Avenue, Apartment 2B via the front door to the apartment.

71.    Based the above-detailed physical and electronic surveillance, and on my review of the content of the aforementioned calls (detailed in paragraphs 57 through 68), I believe VINCENT has additional cellular telephones, separate and apart from the **Target Telephone**, that he uses to communicate with drug customers to facilitate his drug trafficking activities. Based on my training and experience, I know that drug dealers often use one phone to communicate with customers and another phone(s) to communicate with their source(s) of supply. Therefore, I believe VINCENT uses the **Target Telephone** to communicate with his supplier (PICHARDO) and other co-conspirators engaged in drug trafficking activity, and that he uses other cellular telephones to communicate with his drug customers.

D. **Probable Cause that the Target Telephone and Other Cellular Telephones, Used by Ronald Vincent to Facilitate Drug Trafficking, are Located in 275 Circular Avenue Apartment, 2B, Hamden, CT**

72.     Based on numerous pertinent intercepted calls on target telephones used by CHRISTIAN PICHARDO and/or EVERARD BOOTHE from approximately April 25, 2023 through July 27, 2023[2], which included numerous pertinent intercepted calls with RONALD VINCENT during the same period, I believe VINCENT uses and possesses the **Target Telephone** and other cellular telephones to facilitate his drug trafficking activities.

73.     Based on subscriber information and call detail records the BSSTF received from AT&T on August 31, 2023, the **Target Telephone** is still subscribed to Ronald Vincent at 275 Circular Avenue, Apartment 2B, Hamden, CT (**Target Location**), and the service is still active.

74.     Law enforcement has observed on numerous occasions, via physical and electronic surveillance, VINCENT exit and enter 275 Circular Avenue, Apartment 2B, Hamden, CT (**Target Location**) at various times of day, including as recently as September 6, 2023 (as detailed above in paragraph 70).

75.     Based on VINCENT's use of the **Target Telephone** and other cellular telephones to facilitate his drug trafficking activities (as described herein)**,** his established residence as identified through subscriber information and electronic/physical surveillance, there is probable cause to believe, and I do believe, that VINCENT possesses the **Target Telephone** and other

---

[2] A review of telephone toll records for telephone number 203-648-2139, used by EVERARD BOOTHE, revealed the **Target Telephone**, used by RONALD VINCENT, was in contact with telephone number 203-648-2139, dating back to January 30, 2022.

cellular telephones inside the **Target Location**.

## TRAINING AND EXPERIENCE OF THE AFFIANT

76.    Based upon the totality of the facts and circumstances set forth herein, and based on my training and experience and consultations with fellow law enforcement officers, I know:

a.    that narcotics traffickers possess and use cellular telephones to facilitate, and in furtherance of, their drug trafficking activity;

b.    that narcotics traffickers maintain their cellular telephones on their person and/or store them inside their residences where they are readily accessible in order to maintain timely communication with customers, sources of supply, and other members of their drug trafficking organizations/networks;

c.    that narcotics traffickers may have access to several cellular telephones, and that they periodically use newly acquired cellular telephones;

d.    that narcotics traffickers segregate various aspects of their illicit business, and use different telephones to handle the various aspects of their operation to thwart law enforcement and insulate themselves and their confederates. For example, narcotics traffickers may use one phone to communicate with customers and another phone to communicate with their source(s) of supply or other members of the drug trafficking organization. In addition, narcotics traffickers often use different phones to deal with different "lines" of customers. For example, narcotics traffickers may use one phone to communicate with customers who regularly purchase small, pre-packaged quantities of narcotics and another phone for customers who regularly purchase larger quantities. Or narcotics traffickers may use different phones to distribute different types of narcotics. Finally, narcotics traffickers may utilize two or more cellular telephones interchangeably for all their narcotics trafficking

36

undertakings to enable them to accommodate a high volume of narcotics trafficking calls. The use of two or more phones interchangeably also enables distributors to immediately terminate service on one phone – if they believe the phone is being targeted by law enforcement – without crippling their illegal business;

e.  that narcotic traffickers maintain names, addresses and/or telephone numbers of their clients and associates in the drug trafficking organization in their cellular telephones. Traffickers also maintain photographs and video of participants and associates in narcotic trafficking activity, and property acquired as a result of narcotics trafficking activities. Drug distributors also communicate with their criminal associates via text message and also various encrypted applications and they frequently make use of and maintain multiple cellular telephones to compartmentalize operations and upon which those text messages and encrypted communications often remain stored; and,

f.  that narcotics traffickers often use cellular telephones subscribed to other persons and pre-paid cellular telephones that require the purchaser to provide little or no identifying information to purchase and utilize the phone, all of which is done in an effort to avoid detection and thwart the efforts of law enforcement.

## INFORMATION REGARDING CELLULAR TELEPHONES AND THE REQUESTED SEARCH WARRANT

77.    Based on my training and experience, and as set forth in this affidavit, I know that cellular telephones are used by individuals who are involved in criminal acts and acts of violence to communicate regarding their criminal activities, and I have probable cause to believe that the **Target Telephone** was used by RONALD VINCENT to communicate criminal activity related to the **Subject Offenses**.  I further believe that there may be communications on the **Target**

37

**Telephone** relating to potentially other co-conspirators. I therefore request permission to search the **Target Telephone** for evidence of the **Subject Offenses** and also evidence of potential other co-conspirators.

78.     Based on my training and experience, I know that the **Target Telephone** may have some or all of the capabilities that allow each one to serve as a wireless telephone, digital camera and video recorder, portable media player, global positioning system navigation device, hand-held radio, and a personal digital assistant. In my training and experience, examining data stored on devices like the **Target Telephone** can uncover, among other things, evidence that reveals or suggests who possessed or used the particular device, as well as evidence relating to other persons with whom the device's user was in contact.

79.     Furthermore, based on my training and experience, I know that internet browsing history stored on cellular telephones can contain evidence of text communications between persons who conspire to commit criminal activity together. Based on my training and experience, I also know that internet browsing history stored on cellular telephones can contain evidence of internet searches for locations and addresses. Here, such browsing history may contain information about the targeted robbery locations or evidence of the defendants searching the news for reports of the robbery after the incident. There may also be evidence of searches for firearms or information about the vehicles used in the robberies. Further, based on my training and experience, I know that cellular telephones may contain videos and images of co-conspirators; information regarding possible locations to rob; information concerning the proceeds from the robberies; and information concerning firearms. Specifically, based on my training and experience, I know the following information tends to exist on cellular telephones, including telephones used by those committing criminal acts:

38

a.      the telephone number, ESN number, IMEI number, other identifying number, serial number, and SIM card number of said telephone;

b.      the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of said device;

c.      descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;

d.      any and all records, however created or stored, which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

e.      any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

f.      GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

g.      saved searches, locations, and route history in the memory of said devices;

h.      internet browsing history, to include, internet searches in the memory of said device; and

i.      images and videos in the memory of said device.

80.    It is requested that the Court authorize law enforcement agents to retrieve the above-described stored electronic information by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device. I

am aware that in some cases the software or equipment necessary to analyze cellular telephones in this manner is not readily available to law enforcement during the course of the execution of a search and/or arrest warrant. Further, turning on cellular phones in a non-laboratory setting, where there is no "jammer" or radio shielding devices, permits additional signals to be received by the telephone and thereby alters the data present in the phone at the time of seizure. Therefore, it is often necessary to remove a seized phone to a laboratory in order to preserve the data therein from being corrupted.

81.     It is also requested that the requested search warrant be deemed executed once the **Target Telephone** has been seized in the manner described above, and that further analysis of the images be permitted at any time thereafter.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

82.     The requested search warrant for the **Target Telephone** would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

83.     As described above and in Attachments A-2 and B-2, this application seeks permission to search and seize information and things that the **Target Telephone** might contain, in whatever form they are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, information that has been viewed via the Internet is typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

84.     Searching for the evidence described in Attachment B-2 may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct

carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B-2, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, the FBI, or other law enforcement agency, intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B-2.

## CONCLUSION

85.    Based on the evidence as a result of the investigation in this case, there is probable cause to believe and I do believe that the **Target Location** and the **Target Telephone**, which are more fully described in Attachments A-1 and A-2, contain contraband, fruits, instrumentalities, and evidence of the Subject Offenses, which are more fully described in Attachments B-1 and B-2.

## REQUEST TO FILE UNDER SEAL

86.     I further request that this affidavit be filed under seal until further order of the Court, as the investigation is continuing, and it is my belief that, disclosure at this time could compromise the investigation and/or the safety of the cooperating sources and the law enforcement authorities conducting the investigation.


**SPECIAL AGENT MATTHEW LOUCKS**
**FEDERAL BUREAU OF INVESTIGATION**


Subscribed and sworn to before me this _12th_ day of September 2023 at _Bridgeport_, Connecticut.


**S. DAVE VATTI**
**UNITED STATES MAGISTRATE JUDGE**
**DISTRICT OF CONNECTICUT**

\

## ATTACHMENT A-1

### Property to Be Searched

1) 275 Circular Avenue Apartment 2B Hamden, CT 06514 ("**Target Location"**) which is the second two-story apartment from the left edge of a four-unit structure (facing the front of the structure) with white vinyl siding and a red front door. The alpha-numeric "2B" is clearly marked in a window at the top of the front door. The residence has a dividing wall between each apartment front door, and a small balcony above the front door. There is an attached garaged to the right of the front door.

## ATTACHMENT B-1

### Particular Things to be Seized in 275 Circular Ave, Apt 2B, Hamden, CT

The following items evidencing violations of 21 U.S.C. § 846 (Conspiracy and Attempts to Distribute Controlled Substances); 21 U.S.C. § 841(a)(l) (Unlawful Possession with Intent to Distribute, Distribution and/or Manufacture of Controlled Substances); and, 21 U.S.C. § 843(b) (Unlawful Use of Communication Facility), specifically:

a.  A cellular telephone with call number 203-864-8308 (referred to as the "**Target Telephone**"), serviced by AT&T with IMSI number 310280058450412 and subscriber Ronald Vincent, 275 Circular Ave Apt 2B, Hamden, CT 06514; and,

b.  Cellular telephones.

## ATTACHMENT A-2

### Property to Be Searched

1) A cellular telephone with call number 203-864-8308 (referred to as the "**Target Telephone**"), serviced by AT&T with IMSI number 310280058450412 and subscriber Ronald Vincent, 275 Circular Ave Apt 2B, Hamden, CT 06514.

.

**ATTACHMENT B-2**

**Particular Things to be Seized from the Target Telephone**

All records and information contained in the **Target Telephone**, for the period of January

30, 2022 through Present, to include the following:

1.  the telephone number, ESN number, serial number, and SIM card number of the telephone;
2.  the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the telephone;
3.  descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, violations of Title 21 U.S.C. § 846 (Conspiracy and Attempts to Distribute Controlled Substances); 21 U.S.C. § 841(a)(l) (Unlawful Possession with Intent to Distribute, Distribution and/or Manufacture of Controlled Substances); 21 U.S.C. § 843(b) (Unlawful Use of Communication Facility); 18 U.S.C. § 922(g) (Felon in Possession of a Firearm); and 18 U.S.C. § 924(c) (Use of a Firearm in Furtherance of a Drug Trafficking Crime or Crime of Violence), (collectively the "Subject Offenses") (the "Subject Offenses");
4.  any and all records, however created or stored, which tend to demonstrate ownership and use of the device/s, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the telephone;
5.  any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the telephone, such as passwords, sign-on codes, and program design;
6.  GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;
7.  saved searches, locations, and route history in the memory of said telephone;
8.  internet browsing history, to include, internet searches in the memory of the telephone;
9.  images and videos in the memory of the telephone; and,
10. evidence of user attribution showing who used or owned the telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described telephone may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device/s.